United States Court of Appeals
Fifth Circuit

**F I L E D**

June 20, 2005

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03 - 50120

_____

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

ARMANDO GARCIA QUIROZ, also known as Mando; LUCIANO CHAPA;
FRANCISCO RIOS BALDERRAMA, also known as Kiko,

Defendants - Appellants.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN
DISTRICT OF TEXAS
MO-00-CR-141-2

_____

Before Davis, Stewart, and Dennis, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:[*]

Defendants-Appellants Armando Garcia Quiroz (Quiroz),

Francisco Rios Balderrama (Balderrama), and Luciano Chapa (Chapa)

appeal their convictions for Continuing Criminal Enterprise and

drug trafficking. For the reasons stated below, we affirm all

three convictions.

I.

In September of 2001, the government indicted 29 individuals

in connection with the illegal activities of a criminal

organization known as "Los Tres de la Sierra", i.e. "The Three

_____

[*]Pursuant to 5ᵀᴴ CIR. R. 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5ᵀᴴ CIR. R. 47.5.4.

from the Mountains". The government charged that this organization imported large quantities of marijuana from Mexico and distributed it in the United States. Among those indicted were Balderrama and Quiroz, two of the three leaders of the organization and Chapa, one of the organization's smugglers. The indictment detailed several overt acts committed in the furtherance of the continuing criminal enterprise, including: (1) various instances of drug smuggling, and (2) the murders of Israel Pena Ocon (Ocon) and Rigoberto Loera-Carillo (Loera), allegedly ordered by Balderrama as punishment for stealing drugs and profits from the organization.

Balderrama and Quiroz were extradited from Australia, pursuant to the Australia - U.S. Extradition Treaty in May of 2002.

Defendants' four week trial ended in September of 2002 and resulted in guilty verdicts against Balderrama and Quiroz on the following counts: one count of engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848 and § 846 (Count 1); one count of conspiring to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1) and § 846 (Count 2); one count of conspiring to import marijuana from Mexico to the United States, in violation of 21 U.S.C. § 952(a), § 960, and § 963 (Count 3); eight counts of possession with the intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts 5, 6, 7, 10, 12, 13, 14, & 17); one count of

-2-

conspiring to commit money laundering, in violation of 18 U.S.C. § 1956 (h) and 21 U.S.C. § 846 (Count 19); and four counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(I) and (2) (Counts 21, 22, 23, & 24). The jury found Chapa guilty of one count of conspiring to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1) and § 846 (Count 2); and one count of conspiring to import marijuana from Mexico to the United States, in violation of 21 U.S.C. § 952(a), § 960, and § 963 (Count 3).

On January 23, 2003, the district court sentenced Balderrama and Quiroz to mandatory life terms for Count 1, life imprisonment on Count 3, 480 months on Counts 5, 6, 7, 10, 12, 13, 14, and 17, and 240 months on Counts 19, 21, 22, 23, 24, all to run concurrently. Chapa was sentenced to 120 months on Counts 2 and 3, to run concurrently.

Defendants raise a number of issues on appeal, which we discuss below.

## II.

During trial, Defendants objected to the jury venire as violating the 6th Amendment to the Constitution and the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861, in its failure to represent a fair cross-section of the community. They argue that, because the jury venire is drawn from voter registration lists and Hispanic voters register in substantially

lower numbers than non-Hispanics in the Midland area, the number of Hispanics in the jury venire is not a fair representation of the number of jury-eligible Hispanics in the community. The district court found that Defendants failed to make a prima facie showing that the jury selection process violated the fair cross-section requirement.

In order to establish a prima facie case of violation of the fair cross-section requirement, a defendant must demonstrate the following:

    (1)   that the group alleged to be excluded is a "distinctive" group in the community;

    (2)   that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

    (3)   that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

U.S. v. Olaniyi-Oke, 199 F.3d 767, 773 (5th Cir. 1999), citing U.S. v. Alix, 86 F.3d 429, 434 (5th Cir. 1996). The parties' debate concerns the second prong of this test, i.e. whether the representation of Hispanics in the federal jury pool is "fair and reasonable" in relation to the population of jury eligible Hispanics in the Midland community.

Both parties accept the district court's finding that an 11.22% disparity exists between the number of Hispanics in the federal jury pool and the number eligible for jury duty in the Midland area.

Given the disparity of 11.22%, we agree with the district

-4-

court that Defendants failed to prove their prima facie case of a 6th Amendment fair cross-section violation because they are unable to demonstrate that the disparity is more statistically significant than the 11% disparity which this Court found insufficient to sustain a claim of racial discrimination in Thompson v. Sheppard, 490 F.2d 830 (5th Cir. 1974). Appellants attempt to distinguish Thompson by arguing that it is a civil rights case involving claims of subjective intentional racial discrimination. We, however, reject this description of Thompson and, consequently, this distinction. In Thompson, black citizens of Dougherty County, Georgia brought a § 1983 action to enforce their right to serve on grand and petit juries in the courts of that county. The Court distinguished Thompson from previous cases where officials selected potential jurors non-randomly and without objective criteria. In Thompson, the disparity resulted despite the use of objective criteria and random selection. Thompson, 490 F.2d at 832 - 33. The jury pool in Thompson was "compiled by a computer process which automatically selected every fourth name on the voter list". Id. at 831. The jury selection process in the Midland division is similarly random, as described by the district court in its February 3, 2003 Order.

In holding that the jury system in Thompson was not discriminatory, the Court stated:

> We conclude that a jury list drawn objectively, mechanically, and at random from the entire voting list of a county is entitled to the presumption that it is drawn from

-5-

a source which is a fairly representative cross-section of the inhabitants of that jurisdiction.

Id. at 833. In Thompson the discrepancy between the number of African Americans in the community and those in the jury wheel was 11%. Because we decline to find that a disparity of 11.22% is significant where one of 11% is not, we affirm the district court's conclusion that Appellants failed to make a prima facie showing that the jury venire violated the fair cross-section requirement of the Sixth Amendment and the Jury Service and Selection Act.

## III.

Appellant Balderrama argues that (1) the indictment was insufficient and constructively amended by the district court to charge Defendants for the murders of Loera and Ocon, and (2) that charging Defendants with those murders violates the Specialty Doctrine and the terms of the extradition from Australia.

The record and trial transcript belie Balderrama's argument and reflect that Defendants were never charged with these murders nor did the jury impermissibly punish Defendants for these murders.[1] Indeed, the district court specifically instructed the

_____

[1]While the fact that Defendants were never charged with murder is sufficient to answer all of these arguments, it is also relevant to note that Defendants have no standing to assert their Specialty Doctrine Argument. This Court's decision in U.S. v. Kaufman, 874 F.2d 242, 243 (5th Cir. 1989), precludes a criminal defendant from arguing the Specialty Doctrine when the asylum state, here Australia, has failed to raise an objection to the proceeding. Australia never objected to the trial or sentencing, thus Balderrama's Specialty Doctrine argument must fail.

jury that Defendants were not charged with murder.[2]

IV.

We are unpersuaded by Appellants Balderrama and Quiroz's argument that the district court erred in admitting extrinsic evidence of the murders (and additionally, the kidnapping of Sabino Gardea) during trial. Under this Circuit's decision in U.S. v. Abrego, 141 F.3d 142, 174 (5th Cir. 1998), evidence of murders in furtherance of a continuing criminal enterprise is intrinsic, rather than extrinsic, evidence because the murders, as overt acts, "are themselves part of the act charged". U.S. v.

---

[2]In explaining the prosecution's burden, the district court told the jury the following:

> ...They've got to prove their case beyond a reasonable doubt. They've alleged conspiracies here. They've alleged that thee killings had something to do with the conspiracies.
> In the end, you have to decide whether the Government is going to prove these conspiracies beyond a reasonable doubt. If the Government doesn't prove it, then the Defendants must be acquitted. If the Government does prove it, then the Defendants must be found guilty. But you decide if they prove it. Nobody else... We're not here to decide – – **We're not trying a murder case. There is no murder count in this indictment. We're not trying a murder case. We're trying a conspiracy case... The Government must prove a conspiracy here. They say these killings had something to do with the conspiracy. You will decide if that's the case or not. But there is no murder count in this indictment** and those matters would have been reserved for the state and the state has not brought an indictment in that regard.

Emphasis added, Record, Vol 26 at 1242 - 1243.

<u>Miller</u>, 116 F.3d 641, 682 (2nd Cir. 1997). The government presented evidence that Balderrama ordered these murders in retaliation for marijuana being stolen from the Los Tres de la Sierra organization. The district court, therefore, did not abuse its discretion in admitting the evidence of the murders and kidnapping.

V.

The record does not support Balderrama's next argument that the district court failed to give a limiting instruction concerning the appropriate treatment of co-defendants' guilty pleas. The district judge charged the jury as follows:

> Accomplice - Co-Defendant - Plea Agreement: In this case, the government has called as witnesses alleged accomplices, some of whom are named as co-defendants in the indictment, with whom the government has entered into plea agreements providing for the dismissal of some charges and possible lesser sentences than the co-defendants would otherwise be exposed to for the offenses to which the co-defendants plead guilty. Such plea bargaining, as it is called, has been approved as lawful and proper, and is expressly provided for in the rules of this court.
> An alleged accomplice, including one who has entered into a plea agreement with the government, is not prohibited from testifying. On the contrary, the testimony of such a witness may alone be of sufficient weight to sustain a verdict of guilty. You should keep in mind, however, that such testimony is always to be received with caution and weighted with great care. You should never convict a defendant upon the unsupported testimony of an alleged accomplice unless you believe that testimony beyond a reasonable doubt. The fact that an accomplice has entered a plea of guilty to the offense charged is not evidence of guilt of any other person.

5 R. 001096 - 97. Balderrama provides no reason, nor are we able to conceive of one, as to why this limiting instruction does not

objectively inform the jury what weight it should give to co-defendants' guilty pleas.

## VI.

Balderrama argues next that the district court's failure to provide him with an interpreter to aid him in understanding the proceedings and assisting his lawyer in his defense rendered the trial fundamentally unfair.

The record demonstrates that, in addition to a lawyer who spoke some degree of Spanish, an interpreter was assigned to sit between, and assist, Balderrama and Quiroz during the trial. While Balderrama argues that having to share an interpreter with Quiroz inhibited the openness of his communication with his attorney, given the nature of the joint defense Defendants coordinated, the district court provided Balderrama with a sufficient interpreter under the Court Interpreter's Act, 28 U.S.C. § 1827(d)(1) and this Court's holding in U.S. v. Tapia, 631 F.2d 1207 (5th Cir. 1980). Also, Balderrama's claim fails for the additional reason that he demonstrates no prejudice which resulted from the lack of an interpreter assigned solely to him.

## VII.

Additionally, Balderrama and Quiroz raise the following arguments: the government committed prosecutorial misconduct when it moved to consolidate indictments MO-00-CR-141 and MO-010-CR-128; the district court erred in not holding a hearing on Defendants' motion for a new trial based on the newly discovered

evidence that a government witness, Rosie Soles, perjured herself during the trial; the district court committed error in admitting hearsay statements not in furtherance of the conspiracy (specifically a song that Arturo Sanchez wrote for Balderrama and Quiroz about the marijuana operation); and that the district court erred in granting the government's motion in limine to prevent counsel from asking any witness if other witnesses were lying.

After a careful review of the record and the briefs, we are satisfied that none of these arguments have merit.

VIII.

Chapa argues that the district court erred when it held that he was barred from relitigating his motion to suppress evidence the government obtained following a traffic stop of his vehicle and seizure of drugs. The district court ruled that the denial of the identical motion in a previous trial collaterally estopped Chapa from retrying this issue. The only new evidence Chapa sought to provide was information regarding traffic patterns which, Chapa argues, would undermine the credibility of the Border Patrol agent's testimony. We are unpersuaded that such evidence could affect the Court's finding that the Border Patrol had reasonable suspicion to stop and search Chapa's vehicle and to detain Chapa. Because Chapa is unable to demonstrate that the result would have likely been different had he been permitted to retry his motion, we must reject this argument.

-10-

## IX.

For these reasons, and the reasons stated in the district court's November 9, 2004 "Order Denying Defendant's Motion to Reconsider Previous Denial of Defendant's Motion to Reconsider", 2004 U.S. Dist. LEXIS 22712, No. MO-00-CR-141 (W.D. Tx. November 9, 2004), we affirm the convictions of Appellants Balderrama, Quiroz, and Chapa.